The last case on our calendar is Novick v. AXA Network Good morning. I can say good afternoon. You can. May it please the Court, Lynn Fishman Uniman from the law firm of Andrews-Kirth Kenyon for Stephen Novick. I would like to start today with the motion to dismiss whereby the Court dismissed Mr. Novick's tort claims. The complaint asserted both contract claims and tort claims. The lower courts merrily dismissed the tort claims on the docket simply saying that they are duplicative of the breach of contract claim and referred to the record. Why are they not? They are not, Your Honor, because Mr. Novick alleged a contract claim. He did. His contract claim was that he was an independent contractor for both AXA entities. And he had a clarifying document. And that document, it was his claim, entitled him to keep his clients. The breach of contract claim, and there were two, one was unfair business practices and the other was tortious interference with prospective economic relations. So under the contract, even if AXA could have competed and that was the issue that the lower court said was to go to the jury, it had to do so properly. We cite to SuperUSA v. Samsung which holds where the facts constituting the breach of contract also constitute a breach of an independent legal duty as a separate claim for tort will lie. And the independent duty was not to interfere with the contract. The independent duty was not to compete unfairly and not to interfere with the contracts, the prospective economic contracts with people who had been Mr. Novick's clients for years. Why don't all these rights emanate from the contract? They do not emanate from the contract. They are independent torts. Now, if we look at what was alleged in the complaint to support the tort claims, there are very distinct matters. First, it was alleged about the letter that was sent by AXA to Mr. Novick's clients. And this was not your ordinary letter that says your broker left, let me introduce you to a new person. It had that language, but it also had from the executive vice president who wrote, I ask that you call me immediately if you are contacted by any person suggesting that you transfer the investment account you have with us. There can be disadvantages to transferring your account. The second was AXA filed in lightning speed Mr. Novick's U5. They were entitled to, but they did it just one day after they summarily terminated him, and they had 30 days to do so. And what else did they do? They sent representatives to visit his clients, visiting one client at 7 AM. They made disparaging remarks about him. They became aggressive with his clients. Indeed, one client said in an affidavit that they threatened to terminate a long-term friendship if the client went and took his business with Mr. Novick after he left. In short, Mr. Novick's clients were intimidated. The AXA representatives made them question Mr. Novick's integrity. They said that. Question his ethics. They said that. Question his character and his morals. If you are entitled to compete under a contract, and that was what was to go to the jury, you need to compete fairly. I thought the issue before the district court was whether there was a duty not to triage. That is another part of the claim. No, but I thought that that's what was argued in the district court. No, what was also argued in the district court was that there was an unfair competition, as was alleged in the fourth cause of action in the Second Amendment complaint. There were two elements, and I'm going to get to the triaging. And I must note that the triage— Isn't that what we're talking about now, the triaging? Well, we're talking—the unfair competition is the triaging, yes. And that's what you claimed was a breach of the contract, wasn't it? Well, no. The breach of the contract was the contract said that they could not—that AXA—this was in dispute— that AXA could not—that Mr. Novak owned a proprietary interest in his clients. Therefore, if they went out and triaged them, yes, it could fall under the rubric of the breach of contract, but that did not make it exclusively a breach of contract claim when these other acts were alleged that gave rise to the tort of unfair competition. There was also another tort alleged, which was with prospective economic advantage. And to allege that tort, there were four elements. One, the existing business relationship between Mr. Novak and third parties. Here, I don't think that was really at issue. Everybody knows that Mr. Novak had these relationships with these clients. Indeed, that's why he was hired by AXA specifically for these relationships. The next is that the defendants knew of the relationships. I think that's pretty clear, and intentionally interfered with them. And I'm not going to go through that litany again. The third element is that the defendant acted with the sole purpose of harming Mr. Novak or used—or used— unfair, dishonest, or improper means. Intimidating clients, talking about ethical breaches are indeed improper and dishonest means. At trial, indeed, one of Mr. Novak's test—one of Mr. Novak's clients testified that he received a phone call from Joel Miller, from AXA, telling me that Stephen Novak had violated ethical regulations, that he might go to jail, and that my account might be in danger if I kept it with him, and that I should transfer it immediately to him and the other people of AXA. There was also injury to the relationship at the pleading stage. Mr. Novak identified at least one client who left him because of AXA's actions. The tortious interference claims should not have been dismissed. There were independent facts. These duties arose independently from the underlying contract? Exactly. They arose out of fair business dealings. Weren't they inextricably intertwined? Whether or not they are inextricably intertwined, Your Honor, respectfully under the Super test, is not what we need to look for. Because, as Super says, the same exact facts could be a breach of contract and a tort at the same time. And if we look at the law in this jurisdiction, the tort of unfair competition has indeed been described as a capacious tort. One that includes various forms of improper business dealings. All right, thank you. Your time has expired. You've reserved two minutes for rebuttal? Yes. We'll hear from AXA. Good afternoon. May it please the Court. I'm Frank Morris, here for the AXA entities who are at the leads in this matter. I'm surprised by the argument that's made, both on the fact of what it is that is being contended, as well as the circumstances of what was actually presented to the court during the trial and what the trial court permitted. In fact, the evidence around the supposed misdeeds, which I think is grossly misstated, and does not state elements of the tort claims that were properly dismissed, nonetheless, the evidence that came in before the jury related to what the supposed misdeeds were. The judge, in the instructions to the verdict form in Question 3, has plaintiff proven by a preponderance of the evidence that AXA improperly interfered with the rights of customers to choose to do further business with Novick. Note the judge didn't say, did AXA only interfere with contract rights? He said, did they improperly interfere? And in an hour and 15 minutes after a 10-plus day trial, the jury came back and answered all three of those questions, that there was nothing improper that was done here. Do you deny that the rights, the tort rights, emanate from a separate contract than the employment contract? No, I completely agree that the rights did come from the clarifying documents from the contractual agreements. Absolutely, that's where the rights came from, and thus were properly resolved by the judge because of the fact that that was the emanation of the rights that were in question here. There was no dispute about that. What counsel talks about is a theoretical situation where you might have something entirely separate that does not apply in this case. In a different case, perhaps, but not on the facts in this case, Your Honor. Does that make any difference? It's the second contract that prohibited the tortious interference. Tortious interference. There is nothing here that was tortious in any event, Your Honor, whether you call it the rights arising out of the contract. Your argument is even if the tort claims were not dismissed, the jury's verdict would have shown that they would have, he would have lost. That's two parts. Yes, absolutely, Your Honor, that the jury verdict, because we have the specifics here of what the jury was questioned about and the question the jury answered, and it was the broad issue of was there improper interference. Those are the words. Did AXA improperly interfere with the rights of customers to choose to do further business with Novick? So they had a right to properly interfere? I mean, did they have a right to interfere at all? They had the right economic defense, which is a defense to these, to the tort claims. If there were tort claims, they had the right to go after the business just as Novick did. They had the right to go after the business that had been serviced. These were Novick's preexisting clients? They may or may not have been, Your Honor, in some cases perhaps and in some cases not. But in any event, when he came and took the benefit of his deal with AXA, the documents that were executed stated what the rights were, the clarifying document, and the rights generally under the law is there is no exclusive nature here. Both parties had the right as they did. He was out in the marketplace competing within two weeks for the services, to continue the services for those clients. AXA had the right to continue to serve those who it had been serving. Individuals, the FINRA regs make it quite clear, of course, that clients have the rights to go where they want. The decision was the client's, but both parties had the fair right to compete for that continued business. Even though that was his list of clients that he brought to the deal? They didn't remain his property? No, Your Honor, not under the agreements in question. They were not his property. If anything, the clients were actually AXA's property, but both had the right to compete for the continuation of doing business with those entities. They had the right to compete aggressively, as counsel just described, accusing him of a lack of ethics in his business dealings? I think counsel's taken some liberties with what's actually in the record with regard to this, but they clearly, and there is the issue of the fact that he was violating both AXA rules and FINRA rules with regard to the activity of selling away. That's why his agreements were terminated. After an investigation by the National Compliance Office, he was found to have been engaged in the selling away activities. That exactly is violative of rules and I think is not appropriate conduct. So to the extent that they were making clear to clients, and it is also accurate, if you move these kinds of products, you may be paying excess fees and losing benefits when you move these kinds of products. And so it was perfectly appropriate and fair to say you need to look carefully at the entire picture before you make a move. In other words, it was true? Yes, Your Honor. It is true to say that there may be disadvantages to shifting the business. Absolutely, Your Honor. So I have a separate question. Yes, Your Honor. That has to do with the attorney's fees that you sought here and that were awarded. It seems to me in looking at this record that, at least with regard to some of them, you were getting fees for work done on the issues unrelated to the notes, and that's a problem, it seems to me. There's a motion for summary judgment that you filed that contained a motion for summary judgment on the notes, but also contained a summary judgment to dismiss various claims of NOVIC. And that seems to me a bit of a problem, as well as the work that you did to file an answer to the complaint, which contained required work other than on the notes. And also whether you got fees on fees is another issue here, and I just wondered if you could speak to that. I'd be happy to, Judge Barker. I think that what we have to understand is this case has a nine-year life, and the way that Mr. NOVIC pursued that case during those nine years was to intertwine what was due and owing on the notes that he had signed, as well as his claims, and said that they were related, and indeed he was seeking offsets to the notes based on his arguments. Judge Hellerstein presided over this for nine years and was in the position to know, based on that nine-year history, what work had been done and what work was required to be done under the circumstances, because of the intertwining. He just took your request and just granted it, didn't he? I don't think so. His order makes it pretty clear that he did follow the appropriate standards, and this is an area where the judge has extra discretion, if anything, because — I understand, but it's still not unreviewable. Clearly not, Your Honor. I think what we see is he brought to bear, and the indication in his order is he brought to bear what he knew about nine years of this case and, therefore, what was justified. In fact, with regard to — there were summary judgment motions with regard only to the fees issues, as well as the broader and overall issues. Well, it seems to me that the fee issue — excuse me, the notes issue is very discreet, and one could easily determine what the work was done on that part of it, and then all the rest is surplusage. You would think, Your Honor, that the work on the notes would be discreet, if you will, but in the context of this case and the way Mr. Novick chose to litigate this case, it was anything but discreet. That's — that's the reason why I think it's entirely appropriate for what, in fact, was the order with regard to the award of fees that Judge Hellerstein entered in this case, based on his knowledge of the fact of that intertwining throughout the case of the theories that were brought by the plaintiff and how he said those affected the notes, among other things. So they were not — in normal circumstances, if somebody's suing on a note, it might well be an entirely discreet or collateral matter. Can you give me an example of the intertwining where a substantial amount of work, seemingly not based on the notes, was done but ought to be compensated? Well, Your Honor, among other things, he was seeking accounting, which he thought related to what would be due and owing on the notes. His approach on the issue of what his compensation — he argued, remember, in this case strenuously, rejected by the jury promptly, that he was not properly compensated. His argument around his compensation, he would have said would reduce — if he had been properly compensated, his argument was that would have reduced what was still due and owing on the note. Those are two examples, Your Honor, of how they were intertwined. Well, the triaging has nothing to do with the notes. No, it doesn't. Triage issue. No, Your Honor. Okay. But — and so that would be rather easily separated out. And also, it seems to me that, you know, the answer that you filed, apparently one of the attorneys who worked on this listed the work as draft answer, but the other work — but later on listed her work as draft answer and counterclaims, implying that that's — they're different. And the answer probably included the counterclaims as part of that filing. But — so that's — you know, there does seem to be some ways in which one could go through this and pull out the ones that are plainly independent. I'm not saying — maybe the notes aren't independent, but maybe some aspects of the other work are independent. Well, that's, I think, where the discretion of the district court comes in with regard to not having — and this circuit's law is quite clear that the district court judge is not required to go minute by minute, hour by hour, and billing entry by billing entry to make that determination. But if the district judge also assesses it, as we're doing here, that some of the work — you know, a very — an amount of this work was done on matters that did not relate to the notes, then the judge could have said, OK, I'm going to cut it by 15, 20 percent or whatever just to cover that. But we didn't get that here. Well, it may also be that — remember, there was billing discretion with regard to what was originally requested here, and the judge was aware of the fact that there were significant reductions from what might have been. Indeed, there was a very good argument that we could have asked for more because of the intertwining of the arguments. OK. Thank you. Thank you, Your Honor. Counsel, you've reserved two minutes for rebuttal. Yes. Let me first address something that Judge Winter asked about, the notes being intertwined. I want to point something out. There is some interconnection, but that interconnection goes to — Mr. Novick had complained about compensation all the time because it was his understanding that he was to be compensated in one way. His agreements are silent as to how he's supposed to be compensated. It says various schedules. In one case, that may be, and in the other case, various schedules that can change time to time. And what I do want to point out on this issue of being interrelated, they are. One of the notes says exactly what Mr. Novick was claiming, that he was entitled to be paid in gross deal or concessions because that note requires payback in gross deal or concessions. How could that — how could he ever pay it back if he was never being paid in gross deal or concessions? You mean payback for notes. Exactly. And this goes to the whole parole — the parole evidence issue where the court excluded all of that. So you're taking the position that everything was intertwined and the attorney's fees were just fine. No. We're taking the position that, yes, there were things that were intertwined, and in order to figure out what the agreements were, you needed to consider the signed agreements plus the notes. Wasn't one of the agreements — one of the notes forgivable depending on the compensation? Right. Depending on GDC as being the basis for compensation. That's fine. So there's some intertwining there. There's some — they're not intertwining in connection with the attorney's fees because, indeed, the notes were tried to the bench and the other issues were tried to the jury. So they are completely separate for that. There's a lot of work done outside of the courtroom, you know, in pleadings and motions and so forth. But what I also do want to address, the comment that, well, the jury got a broader charge. After the summary judgment motion, Judge Hallerstein identified three issues that were still in the case. And, of course, that guided trial counsel as to how and what he could present and develop in the case. And the third issue was, did defendants violate any express or implied agreement with plaintiff by triaging his book of business? And so Judge Hallerstein clearly tied that issue to, let's look at the contracts and let's see what the contracts say. And that precluded trial counsel from developing more fully the unfair competition claim as well as the tortious interference. So we can't look to what Judge Hallerstein charged to the jury. Indeed, counsel never knew that until the day before the case went to the jury and say, oh, well, they considered that. They could not have considered it because they couldn't have the evidence. Thank you. Thank you. Thank you both. We'll reserve decision. That's the last case on our calendar. So I will ask the clerk to adjourn court. Court is adjourned.